IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BENCHMARK ELECTRONICS, INC.,    )
and BENCHMARK ELECTRONICS de    )
MEXICO, S. de R.L. de C.V.,     )
                                )
            Plaintiff,          )       1:16-cv-529
                                )
        v.                      )
                                )
CREE, INC.,                     )
                                )
            Defendant.          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This is an action by Plaintiffs, Benchmark Electronics, Inc. and Benchmark Electronics de Mexico, S. de R.L. de C.V. ("Benchmark"), seeking recovery from Defendant, Cree, Inc. ("Cree"), for money allegedly owed in connection with installing Cree's lightbulbs into various products. Cree counterclaims for recovery, or offset, for component parts it contends Benchmark either damaged during the manufacturing process or has failed to return.

Before the court are cross motions for summary judgment. Benchmark moves for summary judgment on its breach of contract claim[1] and all of Cree's counterclaims. (Doc. 24.) Cree contends that Benchmark materially breached the parties' contract and moves

---

[1] While Benchmark moves for summary judgment "on all claims" (Doc. 24 at 1), it does not argue in favor of its claim for unjust enrichment (second cause of action).

for partial summary judgment as to (1) its breach of contract (or, alternatively, unjust enrichment) counterclaim; (2) its breach of good faith and fair dealing counterclaim; and (3) all of Benchmark's claims. (Doc. 28.) The motions have been fully briefed (Docs. 25, 32, 34, 29, 31, and 35) and are ready for decision. For the reasons set forth below, the court grants in part and denies in part each party's motion.

## I.    BACKGROUND

The facts, viewed in the light most favorable to the non-moving parties in the cross motions for summary judgment, establish the following:

### A.    The Parties' Letter of Authorization and Related Documents

In 2012, Cree, an equipment manufacturer of light-emitting diode ("LED") lamps and components, issued a Request for Quotes ("RFQ") seeking estimates from contract manufacturers for the manufacture, testing, packaging, and shipping of driver boards and LED boards, two independent components within Cree's "Bengal" product line of lamp products (the "Bengal Project"). (Doc. 32-2 ¶¶ 4-5; Doc. 26-1 at 40-41.) An LED board is a printed circuit board mounted with 10 or 20 LED bulbs. (Doc. 26-1 at 41, 47; Doc. 32-2 ¶ 15.) As part of the proposed arrangement, Cree would provide the contract manufacturer with LED bulbs on consignment to construct the LED boards. (Doc. 26-1 at 17; Doc. 27-20 at 56.)

Consistent with its general practice, Cree communicated a "zero cost" for the consigned LED bulbs in the bill of materials that was provided as part of the RFQ. (Doc. 26-1 at 37-38.) The RFQ did not specify any rate for loss or destruction of consigned LED bulbs during the manufacturing process. (Doc. 26-1 at 41-42.)

On June 12, 2012, Benchmark, a contract manufacturer, responded to Cree's RFQ. (Doc. 26-1 at 45-46; Doc. 26-11.) As part of its proposal, Benchmark provided a per-unit price for LED boards. (Doc. 27-21 ¶¶ 4-6). Benchmark's pricing model for the LED boards accounted for the bill of materials provided by Cree, which listed the cost of the consigned LED bulbs as zero. (Doc. 27-21 ¶ 4.) The pricing model included a line item for "Scrap (and Other MOH)," which factored in the cost of scrapped components as well as the cost of material overhead ("MOH") for managing the various components. (Doc. 27-20 at 36-38; Doc. 27-21 ¶ 5.)[2] While Benchmark used a price of $0.10 to calculate the MOH in its final estimate (Doc. 27-21 ¶ 5; Doc. 27-20 at 40-41; Doc. 26-11 at 14 (noting price of $0.15 was used in original proposal)), the parties dispute whether and to what extent the cost of scrapped LED bulbs were considered in Benchmark's RFQ response. (Doc. 27-21 ¶ 6;

---

[2] In its response to the RFQ, Benchmark defined MOH as the cost "associated with the ordering receiving, inspection, and kitting of the LEDs required for production." (Doc. 26-11 at 14.)

Doc. 27-20 at 38; Doc. 29-3 ¶ 15.)[3]  Cree subsequently awarded the

Bengal Project to Benchmark.  (Doc. 29-3 ¶ 9.)

The parties began negotiating a Contract Manufacturing

Agreement ("CMA") and exchanged draft agreements.  (Doc. 32-2 ¶ 10;

Doc. 26-1 at 35-36.)  On June 29, 2012, Benchmark returned a

redlined draft of the CMA to Cree.  (Doc. 29-3 ¶ 11; id. at 39.)[4]

The draft CMA set out an initial two-year term (Doc. 29-3 at 65)

and contained a Materials Consignment Agreement ("MCA") that

shifted the risk of loss to Benchmark for the consigned material

in its possession (Doc. 29-3 ¶ 11; id. at 65, 76).  The relevant

section of the draft MCA provides:

> Contract Manufacturer shall be responsible for any
> loss, damage, or theft of Consigned Materials for any
> reason while in Contract Manufacturer's possession;
> provided that Contract Manufacturer shall not be
> responsible for actual defective or non-conforming
> Consigned Materials if Contract Manufacturer accounts to
> Cree for such Consigned Materials and follows Cree's
> instructions for return or disposal thereof.  Contract
> Manufacturer shall maintain property insurance that

[3] Cree contends that the line item for "Scrap (and other MOH) . . . set
forth the price per unit allocated to scrapped LED components and the
MOH, or materials overhead, of managing and storing an inventory of
consigned LED components."  (Doc. 29-3 ¶ 15.)  Benchmark's Federal Rule
of Civil Procedure 30(b)(6) witness, Calvin Clemmons, testified that
Benchmark only considered the cost of "scrap" as it relates to the
printed circuit boards and assigned no value to the bulbs because Cree
had communicated a "zero dollar price" in its costed bill of materials.
(Doc. 27-20 at 38, 40-41; Doc. 27-21 ¶ 6 ("Had Plaintiffs known that
Cree was not providing the LEDs at zero cost, but would instead attempt
to charge $0.5684 for each XTE LED (10 or 20 LEDs would be incorporated
into a single board), Plaintiffs would have never agreed to accept only
$0.72 per completed LED Board.").)

[4] According to the Cree, this draft CMA was the last redline draft that
Benchmark returned to Cree.  (Doc. 29-3 ¶ 11; Doc. 32-2 ¶ 10.)

> provides adequate coverage for third-party property consigned to Contract Manufacturer and stored or used on Contract Manufacturer's premises.

(Doc. 29-3 at 76.) The draft CMA also required Benchmark to produce regular production reports, which would track Benchmark's inventory of consigned materials and report any loss of consigned materials to Cree. (29-3 at 52, 79.) However, neither the CMA nor MCA identified a designated scrap rate or attrition rate for the consigned LED bulbs. (See Doc. 35 at 9.)[5]

Even though contract negotiations for the CMA were still ongoing, the parties continued to move forward with their business relationship. In November 2012, Cree issued its first purchase order to Benchmark and agreed to pay $0.72 per LED board. (Doc. 27-21 ¶ 6.) On December 23, 2012, the parties entered into a Letter of Authorization ("LOA"), which authorized Benchmark to purchase materials and components to manufacture the LED boards. (Doc. 8 ¶ 11; Doc. 26-4.)[6] At the time, the parties were still in the process of negotiating a CMA. (Doc. 32-2 ¶ 10; Doc. 26-4 at

---

[5] The draft CMA specified that the provision of services would be authorized by individual purchase orders issued by Cree. (Doc. 29-3 at 50-51.) Benchmark's representative, Calvin Clemmons, similarly stated that, in his experience, original equipment manufacturers did not generally communicate "yield targets" for products in written agreements, but communicated such targets during weekly and monthly quality meetings. (Doc. 27-20 at 25-27.)

[6] While Cree refers to the date of the agreement as December 2, 2012, in several sworn statements (Doc. 29-3 ¶ 10; 32-2 ¶ 9), the LOA is dated December 20, 2012, and the document indicates that Cree executed it on December 23, 2012. (Doc. 26-4; Doc. 29-3 at 36-37.)

4.) The LOA provided that "[t]he parties are currently in the process of discussing and negotiating a Contract Manufacturing Agreement ("CMA") that will supersede this Letter of Authorization ("LOA")." (Doc. 26-4 at 4.) However, the LOA also provides that "If the parties do not execute an [sic] CMA within one (1) year of the final execution of this LOA, then Benchmark has the right to invoice Customer for all Components purchased pursuant to this LOA, whether or not they are Excess and/or Obsolete Components." (Doc. 26-4 at 4.)

As will be seen, Cree eventually decided to discontinue its relationship with Benchmark before a CMA was ever executed. (Doc. 1 ¶ 15; Doc. 8 ¶ 15; 26-1 at 35-36.)

**B.    The Parties' Course of Performance**

**1.    Benchmark's Manufacture of LED Boards**

Following the execution of the LOA, Benchmark began manufacturing Bengal products, including the LED boards at issue. (Doc. 1 ¶ 16; Doc. 32-2 ¶ 11.) Benchmark would purchase raw materials and components to incorporate into the Bengal products. (Doc. 26-4.) Cree also provided Benchmark with consigned materials under two different types of arrangements. (Doc. 27-20 at 55.) At the outset, Cree provided Benchmark with certain materials it had purchased in anticipation of this project. (Doc. 27-20 at 55-57.) Cree attributed a price to these products in its bill of materials. (Doc. 27-20 at 55-57; 26-1 at 16-17.) As Benchmark

consumed these materials, Benchmark would issue a purchase order and Cree would invoice Benchmark for the materials. (Doc. 27-20 at 55-56; Doc. 32-2 ¶ 37.) The parties would regularly track the consumption of these materials on a monthly basis. (Doc. 27-20 at 76-77.)

In addition, Cree provided Benchmark with LED bulbs to manufacture the LED boards under a separate consignment arrangement. (Doc. 26-1 at 17; Doc. 27-20 at 56.) Cree obtained tape from third-party manufacturers and applied individual LED bulbs to strings of reels, which it then shipped to Benchmark. (Doc. 26-1 at 92-93; Doc. 27-20 at 102.) As part of the manufacturing process, Benchmark's machinery picked individual LED bulbs from the reels and installed them into the LED boards. (Doc. 26-1 at 59-60.) Benchmark would then complete performance tests on the LED boards before packaging and shipping them to Cree. (Doc. 27-20 at 125-26.) Cree did not attribute a price to the consigned LED bulbs in the bill of materials, nor did it ever invoice Benchmark for the bulbs. (Doc. 27-20 at 56, 58-59; Doc. 32-2 ¶ 37 (noting it was not Cree's standard practice to invoice contract manufacturers for consigned LEDs.) However, Benchmark regularly accounted for the LED bulbs it received in weekly and monthly reports. (Doc. 32-2 ¶¶ 16-17; Doc. 29-3 ¶¶ 16-18; Doc. 27-20 at 120, 166-67.)

A substantial number of consigned LED bulbs were lost to

attrition or scrapped during the manufacturing process. (Doc. 29-3 at 126; Doc. 34-1 at 2). Due to improper specifications of the reels and malfunctions of the machinery, individual LED bulbs were not properly picked and placed onto circuit boards at times. (Doc. 26-1 at 21-22; Doc. 27-20 at 125 (describing this loss as "attrition").) After the LED boards were manufactured, Benchmark removed and discarded LED bulbs that did not function properly during a performance test. (Doc. 27-20 at 125-26 (describing this loss as "rework"); Doc. 31-1 ¶ 5.) In addition, Benchmark would discard LED bulbs that were incorporated into LED boards that did not function properly or meet the proper specifications. (Doc. 27-20 at 126 (describing this loss as "scrap").)

### 2. Benchmark's Reporting of Scrap Rates for the Consigned LED Bulbs

Benchmark provided Cree with weekly and monthly Inventory Reconciliation Reports ("IRRs"), which provided an accounting of Benchmark's inventory of consigned LED bulbs. (Doc. 26-1 at 131, 135; Doc. 27-20 at 77, 265.)[7] In the IRRs, Benchmark reported the number of consigned bulbs it had received, incorporated into final products, returned to Cree, retained as inventory, and scrapped or

---

[7] Beginning in May of 2013, Cree requested that Benchmark provide IRRs on a weekly basis. (Doc. 26-1 at 119.) Toward the end of the parties' relationship, Benchmark provided IRRs on a less frequent basis as its production declined, but Cree did not object to this development. (Id. at 135-36 (noting the transition from weekly to monthly reports related to the decline in production and stating "I don't think there was a specific conversation on that topic").)

otherwise lost during the manufacturing process. (See, e.g., Doc. 27-15 at 4; Doc. 27-18 at 12; Doc. 27-19 at 9.) Benchmark would generally calculate the attrition rate by counting the number of bulbs that remained on the reel at the end of production, as well as the number of bulbs that were incorporated into LED boards or otherwise discarded after the initial manufacturing process. (Doc. 27-20 at 101-02, 105-06.)[8]

Around May of 2013, Cree requested that Benchmark transition from using XT-E LED bulbs to XB-G LED bulbs in the Bengal LED boards. (Doc. 26-1 at 105-06.) As part of this transition, Benchmark prepared a final inventory reconciliation report for the XT-E LED bulbs, which used the term "Delta" to refer to consigned bulbs that were scrapped or lost to attrition during the manufacturing process. (Doc. 27-20 at 119; Doc. 29-3 ¶ 31.)[9] Benchmark provided Cree with a presentation, which outlined the

---

[8] Benchmark would regularly vacuum out the bulbs that dropped into the machine and store them in its warehouse. (Doc. 27-20 at 105-06, 125.) At this point, Cree acknowledged that the LEDs could not be put to productive use and did not request that they be returned. (Doc. 26-1 at 132.) In a February 2014 email with Cree, a Benchmark employee acknowledged that Benchmark had "2 huge bins" of LEDs that had been vacuumed out of the machines and asked whether Benchmark should return the LEDs to Cree or dispose of them on site. (Doc. 29-1 at 81; Doc. 27-20 at 100-02.) When Cree inquired about the number of scrapped LED bulbs, Benchmark's employee suggested weighing them in order to calculate their number. (Doc. 29-1 at 80.) However, it was not a standard practice for Benchmark to calculate the attrition rate in this fashion. (Doc. 27-20 at 102-04.)

[9] Benchmark contends that this delta report "was the format, apparently, the teams mutually agreed upon" to use for the final reconciliation report. (Doc. 27-20 at 120.)

calculation of the delta value for the consigned inventory of XT-E LED bulbs in the final reconciliation report. (Doc. 26-1 at 115-16; Doc. 27-13.) In this presentation prepared in conjunction with the final report, Benchmark represented two different delta values: (1) a "Delta" value that reflected the number of consigned LED bulbs scrapped during various stages of the manufacturing process; and (2) a separate "DELTA" value that represented the sum of this previous "Delta" value and an additional flat two percent rate of "Attrition." (Doc. 27-13 at 4; Doc. 26-1 at 114-16.) In an internal email dated May 13, 2013, Cree summarized the "delta explanation" provided for the "Delta" value in the presentation, and Cree acknowledges that Benchmark "accurately reported the magnitude of the scrapped XT-E LEDs throughout its relationship up until that time . . . ." (Doc. 32-2 ¶¶ 36, 44.)[10] While Cree invoiced Benchmark for other consigned components at the end of the reconciliation, it did not invoice Benchmark for any consigned LED bulbs. (Doc. 26-1 at 116.)[11]

Beginning in May of 2013, Benchmark began reporting a "delta" value for its inventory of consigned LED bulbs within its weekly

_____

[10] However, Cree maintains that the delta calculation in the May 2013 final reconciliation report is "entirely separate" from the "delta" calculations in the IRRs, noting that the "delta" calculation referred to within the emails referred only to a "delta" value that did not include attrition. (Doc. 32-2 ¶ 44; Doc. 32 at 8-9.)

[11] Cree maintains that it was not a standard practice to regularly invoice contract manufacturers for consigned components as opposed to other consigned inventory. (Doc. 32-2 ¶ 37.)

and monthly IRRs. (Doc. 29-3 ¶¶ 31-35; Doc. 32-2 ¶¶ 29, 33; <u>see</u> Doc. 29-3 at 120 (noting revised "delta" calculations)).) The term "delta" does not have a standard meaning within the industry. (Doc. 29-3 ¶ 30; Doc. 27-20 at 30-31, 212.) Benchmark described the "delta" values as "the gross differences generally between the LEDs Cree shipped to Plaintiffs and the LEDs that were either shipped back to Cree in final products, returned to Cree in raw form, or the LEDs Plaintiffs have on hand that Cree did not want returned." (Doc. 27-21 ¶ 10; Doc. 27-20 at 30 (describing the "delta" value as "any components that were lost during the manufacturing process, plus any parts that were replaced as a result of yield fallout at test, for example").)

In addition to providing a "delta" value, Benchmark included a section entitled "Scrap History," which calculated the number of consigned LEDs that were discarded whenever an entire LED board was scrapped. (Doc. 11 ¶ 22; Doc. 27-20 at 126; <u>see, e.g.</u>, Doc. 32-2 at 82, 88 (8/25/14 report); Doc. 27-19 at 9 (12/29/14 report).) While the formula for calculating the "delta" value was available within the Microsoft Excel spreadsheet provided as part of the report (Doc. 26-1 at 119), Benchmark did not provide any additional explanation for the "delta" value within its weekly and monthly reports. (<u>See, e.g.</u>, Doc. 32-2 at 82, 88 (8/25/14 report); Doc. 27-19 at 1, 9 (12/29/14 report)). The reported "delta" value fluctuated from month to month, at times even decreasing, as

Benchmark accounted for different reels of consigned LED bulbs in production. (Doc. 27-20 at 136-38.)

Once the XT-E LED bulbs were fully phased out in mid-2013, Benchmark reported a "delta" value of 1,607,518, which represents an overall attrition rate of approximately 3.7%. (Doc. 29-3 at 121; Doc. 32-2 at 82, 88.) Benchmark reported this "delta" value in each of its subsequent IRRs. (Doc. 29-3 at 121; see Doc. 27-19 at 9 (12/29/14 report).) Between May 2014 and January 2015, the "delta" value reported for the XB-G LED bulbs rose dramatically, increasing from 1,013,510 to 4,052,477. (Doc. 29-3 ¶¶ 35-36; Doc. 29-3 at 120.) At the conclusion of the parties' relationship, Benchmark prepared a "Delta" report in January of 2015, which reported a negative "delta" value of 4,394,757 XB-G LED bulbs and denoted that the "delta" value translates to a rate of -2% for "attrition and rework." (Doc. 29-3 at 126; Doc. 34-1 at 2.)

The parties dispute whether Benchmark provided an adequate explanation of the term "delta" as it was used in the IRRs prior to the issuance of the January 2015 report. (Doc. 8 ¶ 40; Doc. 26-1 at 115-16.) While Cree disputes that Benchmark ever provided an adequate explanation for the "delta" value prior to this time, Cree never inquired as to what "delta" represented until at least the middle of 2014. (Doc. 26-1 at 116, 120 ("I don't have personal knowledge that somebody at Cree asked Benchmark what the delta

number on this spreadsheet represented. I would've hoped somebody would've asked."); Doc. 8 ¶ 33; Doc. 32-2 ¶ 35; Doc. 27-20 at 129 ("[N]o one had ever contacted me from Cree or internally saying, you know, we're not understanding anything about LEDs.").)

During the course of the parties' relationship, Cree remained actively involved in monitoring and supervising Benchmark's production of its Bengal products, particularly as it related to the LED components. Cree worked with Benchmark to develop the content and format of the weekly IRRs. (Doc. 26-1 at 90; Doc. 26-14 at 1; Doc. 26-19 at 1.) Cree representatives remained in close contact with Benchmark regarding production issues that arose during the manufacturing process. (See Doc. 29-3 ¶¶ 23-26; Doc. 27-20 at 119-20.) Cree employed a local engineer who would regularly visit Benchmark's manufacturing facility in Guadalajara, Mexico, to help address any engineering issues. (Doc. 26-1 at 93-94 (noting that Cree employed a "local Cree Mexico product engineer" who would visit the Guadalajara plant "from time to time" to "support any request that we had that required some local on-site visibility"); Doc. 27-20 at 260 (noting a Cree employees visited approximately every three months).)

Cree communicated frequently with Benchmark regarding the production of LED boards as well as the scrap levels of the consigned LED bulbs in question. (Doc. 29-3 ¶¶ 22-24; Doc. 32-2 ¶¶ 22-24.) Cree requested that Benchmark provide weekly and

monthly reports regarding its inventory of consigned LED bulbs. (Doc. 29-3 at 89.)  During weekly and monthly meetings, the parties discussed measures to improve the efficiency and reduce the scrap rate of the consigned LED bulbs.  (Id. ¶ 24; see id. at 90-93, 95-104, 109-11.)

Beginning at least in April of 2013, Cree communicated a "waste goal" of 0.5% to Benchmark for the consigned LED bulbs. (Id. at 90-93, 95-104, 109-11; Doc. 31-1 ¶¶ 4-6.)  In an April 22, 2013 email, a Cree employee acknowledged that Benchmark had an attrition rate of 2% as a result of packaging issues, but stated that "[o]nce the package issue is resolved Cree's expatiation [sic] is the Attrition Rate will move below .0005% [sic] . . . ." (Doc. 29-3 at 114; Doc. 26-1 at 94-95.)[12]  An April 25, 2013 email from Cree to Benchmark references Benchmark's scrap rate and attaches a Microsoft Excel spreadsheet with a column listing the "% Waste Goal" of 0.5% for consigned LED components during the initial

---

[12] Cree's Rule 30(b)(6) witness, David Power, testified that he had had no discussions with Benchmark regarding any target attrition rate as of April 22, 2013.  (Doc. 26-1 at 104-05; Doc. 27-6 at 1.)  Benchmark's Rule 30(b)(6) witness, Calvin Clemons, testified that he was not aware of any target attrition rate prior to receiving this email correspondence.  (Doc. 27-20 at 94.)  He further characterized Cree's reference to the 0.5% attrition rate as an "aspirational goal" as opposed to a maximum scrap allowance.  (Id.)  Benchmark argues that this rate referred only to LED bulbs that were lost during the initial manufacturing process, as opposed to a maximum attrition rate.  (Doc. 31-1 ¶¶ 4-6.)

manufacturing process. (Doc. 29-3 at 90-93.)[13] However, the parties dispute whether Cree ever communicated a maximum attrition rate for the consigned LED bulbs to Benchmark during either the RFQ process or at any other time in the parties' relationship. (Doc. 27-21 ¶ 9; Doc. 29-3 ¶ 20; Doc. 32-2 ¶ 20.)

Cree experienced several of its own production issues with its LED bulbs that caused higher attrition rates. (See Doc. 26-1 at 33-35, 61-64.) For example, in March 2014, Cree had an issue with packaging of the LED bulbs that went on for "a few months, three months." (Doc. 26-1 at 33-34, 59-61.) Beginning in late December 2013, Cree had an issue with the "pocket sizes" on the tape containing the bulbs, which went on for several months and resulted in a rate of 35,000 defective LED parts per million (3.5%). (Doc. 26-1 at 59-62, 64; Doc. 26-18.) And Benchmark experienced production issues in June 2014 because the LED bulbs were sticking in their packaging as a result of the heat and humidity. (Doc. 26-1 at 24-25; Doc. 29-3 ¶ 25.) As a result, Benchmark reported a scrap rate for consigned LED bulbs well in excess of 0.5% on multiple occasions. (Doc. 8 ¶ 23; Doc. 29-3 at 114 (noting attrition rate of 2% as a result of packaging issues), 110 (noting an attrition rate of 1.112%).) While Cree worked with

---

[13] However, the worksheets and other related materials refer to "used parts," "placed parts," and "SMA," which are associated with the initial surface mount portion of the manufacturing process as opposed to all stages in the manufacturing process in which consigned LEDs could have been lost. (See Doc. 29-3 at 90-93; Doc. 31-1 ¶¶ 4-6.)

Benchmark to address these production issues (Doc. 8 ¶¶ 23-24; Doc. 26-1 at 21-22), it never sought to recover the cost of any bulbs in excess of the alleged scrap rate during the parties' two-year business relationship (Doc. 26-1 at 16-17, 116).[14]  Cree did not invoice Benchmark for consigned LED bulbs or communicate the cost it would assess for them until after Cree notified Benchmark it would be terminating its relationship.  (Id. at 16-17, 27, 116; Doc. 27-21 ¶ 7.)  Cree contends it was not its practice to regularly invoice contract manufacturers for consigned LEDs as opposed to other consigned inventory.  (Doc. 32-2 ¶ 37.)

### 3.  Termination of the Parties' Relationship

In early 2015, Cree informed Benchmark that it planned to terminate the parties' agreement and transition to another contract manufacturer.  (Doc. 8 ¶ 22.)  Around this time, Cree raised questions about the calculation of the "delta" value, alleging that nearly 6 million consigned LED bulbs were unaccounted for in the IRRs.  (Doc. 29-1 at 82, 86-87; 26-1 at 23-24.)  At the conclusion of the parties' relationship, Cree prepared a Consigned Inventory Reconciliation and End of Life Summary ("EOL Summary"), which stated it owed Benchmark certain amounts for outstanding invoices, excess and obsolete components, and excess consigned

---

[14]  Indeed, Cree "forgave Benchmark's obligation to purchase scrap LEDs in excess of 0.5% allowance from time to time."  (Doc. 8 at 8, ¶¶ 23-24; Doc. 26-1 at 21-22.)

materials, totaling $1,333,193. (Doc. 26-5 at 1.)[15] However, Cree sought to offset these amounts, seeking to recover the cost of the "[u]naccounted LEDs" listed in Benchmark's final "delta" calculation. (Id.) Cree attributed a cost of $0.5684 for each XT-E LED bulb and $0.3767 for each XB-G LED bulb but concedes that these prices were not communicated to Benchmark during the course of the parties' relationship. (Doc. 29-3 ¶¶ 47-48; Doc. 26-1 at 27.)

### 4. Benchmark's Remaining Inventory of Consigned LED Bulbs

After Benchmark transitioned to manufacturing LED boards with XB-G LED bulbs in 2013, Benchmark retained an inventory of 395,022 XT-E LED bulbs. (Doc. 27-21 ¶ 13.)[16] The parties dispute whether Benchmark returned the XT-E LED bulbs to Cree in March 2014. David Power, Cree's Rule 30(b)(6) witness, could not recall whether Cree requested that Benchmark return the remaining inventory of XT-E bulbs after Cree transitioned to XB-G bulbs. (Doc. 26-1 at 112.)

---

[15] The EOL Summary was prepared by Doug Stevens, Cree's Director of Operations for Consumer Lighting Products, and stated that Cree owed Benchmark the following amounts: (1) $587,229 for the outstanding accounts payable; (2) $457,105 for consigned inventory reconciliation; and (3) $288,859 for the excess and obsolete inventory. (Doc. 26-5 at 1; Doc. 26-1 at 33.) Cree's Rule 30(b)(6) witness did not dispute that the individual amounts listed in the EOL Summary were owed to Benchmark. (Doc. 26-1 at 31-33; Doc. 26-5 at 1.)

[16] This amounts conforms to the "on hand" inventory for XT-E LED bulbs that was reported in Benchmark's January 2015 "Delta" Report. (Doc. 27-21 at 8.) Benchmark claims that it stopped updating the report after completing the transition to XB-G LEDs in June of 2013. (Id. ¶ 13.)

Benchmark contends it returned the XT-E bulbs to Cree's facility located in Durham, North Carolina, and has provided shipping documents and proof of delivery. (Doc. 27-21 ¶ 13; id. at 12-15.)[17] Cree contends that the package that arrived at Cree's Durham facility did not contain the LED bulbs in question. (Doc. 32 at 10, 18-19.)

Following the conclusion of the parties' relationship, Benchmark retained an inventory of 199,588 XB-G LED bulbs. (Doc. 11 ¶¶ 49-51; Doc. 27-21 ¶ 12.) In June 2015, Benchmark claims it offered to return excess and obsolete material, which it contends included the inventory of XB-G bulbs, but that Cree refused to accept them. (Doc. 27-21 ¶ 12; id. at 10.)

C. **Procedural History**

Benchmark filed this action on May 25, 2016, alleging that Cree breached the parties' agreement or, in the alternative, was unjustly enriched by failing to compensate Benchmark for its products and services. (Doc. 1 ¶¶ 29-30, 34-35.) Benchmark seeks

---

[17] A pro-forma invoice with the invoice number GSJ261024 indicates that the XT-E LEDs are to be shipped to Cree. (Doc. 27-21 at 12.) The invoice contains the same three XT-E part numbers listed as "on hand" inventory in the IRR but denotes slightly different quantities for each part number. (Compare Doc. 27-21 at 12 with id. at 8.) A shipment instruction label with a matching tracking number notes that a pallet was to be shipped to Cree's address. (Doc. 27-21 at 13.) The documentation from the shipper indicates that four pallets were delivered to Cree's headquarters, including the pallet associated with invoice number GSJ261024, and Cree acknowledged receipt of the shipment on March 13, 2014. (Doc. 27-21 at 14.)

to recover $1,330,705.88: (1) $587,229.06 in unpaid invoices (Doc. 1 ¶ 23; Doc. 1-1); (2) $286,371.44 for excess and obsolete components (Doc. 1 ¶¶ 14, 24; Doc. 1-2); and (3) $457,105.38 for excess amounts paid for consigned components (Doc. 1 ¶ 25; Doc. 1-3; Doc. 24 at 2).[18]

Cree counterclaimed, as an offset and affirmative claim, seeking to recover the cost of LED bulbs provided to Benchmark on consignment for the manufacture of LED boards, as well as damages associated with Benchmark's alleged misrepresentation regarding the total number of bulbs lost to attrition during the manufacturing process. (Doc. 8.) Cree brings the following counterclaims: (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 ("UDTPA"); (4) unjust enrichment (in the alternative to its breach of contract counterclaim); and (5) conversion. (Doc. 8.)

Benchmark now moves for summary judgment on all claims and counterclaims. (Doc. 24.) Cree moves for partial summary judgment as to (1) its breach of contract counterclaim (or unjust enrichment counterclaim, in the alternative); (2) its breach of good faith and fair dealing counterclaim; and (3) all of Benchmark's claims.

---

[18] For purposes of summary judgment, Benchmark consents to using the date the action was filed as the date interest began accruing for each of its breach of contract claims. (Doc. 24 at 3.)

(Doc. 28.)

## II.  ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate where the pleadings, affidavits, and other proper discovery materials demonstrate that no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-33 (1986).  The party seeking summary judgment bears the burden of initially demonstrating the absence of a genuine dispute as to any material fact.   Celotex, 477 U.S. at 323.  "Once the moving party meets its initial burden, the non-moving party may not rely upon mere allegations or denials contained in its pleadings, but must come forward with some form of evidentiary material allowed by Rule 56 demonstrating the existence of a genuine issue of material fact requiring a trial."  Ruffin v. Shaw Indus., Inc., 149 F.3d 294, 301 (4th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Celotex, 477 U.S. at 324).

When considering the motion, the court must consider the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  There is no issue for trial unless sufficient evidence favoring the non-moving party

exists for a reasonable factfinder to return a verdict in its favor. <u>Anderson</u>, 477 U.S. at 249-50, 257.

## B. Benchmark and Cree's Breach of Contract Claims

Benchmark contends that Cree breached the parties' agreement by failing to pay for $1,330,705.88 in products and services. (Doc. 1 ¶¶ 30, 35; Doc. 24 at 2-3.) Cree does not contest the amounts Benchmark claims it is owed but contends that Benchmark materially breached their agreement by exceeding an agreed-upon scrap rate for LED bulbs and covering up this fact in its reports to Cree, thus excusing any contractual obligation by Cree. (Doc. 29 at 14.)[19] Cree therefore seeks summary judgment in its favor as to both its breach of contract counterclaim and Benchmark's contract claim. Cree raises breach as both an affirmative defense and as a counterclaim.

### 1. Scope of the Parties' Agreement

In order to assess the breach of contract claims, this court must first determine the scope of the parties' agreement. The contract between the parties is governed by Article 2 of the UCC as it concerns the sale of manufactured goods. N.C. Gen. Stat.

---

[19] While the amounts listed in the EOL Summary do not exactly correspond with those alleged in Benchmark's complaint, Cree has put forward no evidence to dispute the amounts alleged in Benchmark's breach of contract claims. (<u>Compare</u> Doc. 26-5 at 1 <u>with</u> Doc. 1 ¶¶ 23-25.)

Ann. § 25-2-102.[20]  "The Uniform Commercial Code applies more liberal rules governing the formation of contracts than the rules applied under traditional common law." Neugent v. Beroth Oil Co., 149 N.C. App. 38, 45, 560 S.E.2d 829, 834 (2002) (quoting Fordham v. Eason, 351 N.C. 151, 156, 521 S.E.2d 701, 705 (1999)).  Under the UCC, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." N.C. Gen. Stat. § 25-2-204(1); id. § 25-2-207(3) ("Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.").  "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Id. § 25-2-204(3).  Thus, parties may enter into an enforceable contract even though the price of the goods is not settled. Id. § 25-2-305(1).  Under such circumstances, the price is considered to be a reasonable price at the time of delivery.

---

[20] To the extent that the contract can be construed as a mixed contract for goods and services, the court finds that the contract is governed under the UCC because the predominant purpose of the contract is the sale of manufactured goods as opposed to the "rendition of services, with goods incidentally involved." Hensley v. Ray's Motor Co. of Forest City, 158 N.C. App. 261, 265, 580 S.E.2d 721, 724 (2003) (quoting Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir. 1974)).

Id.

A court may consider the parties' course of performance to supplement or interpret a prior written agreement, id. §§ 25-1-303(d), 25-2-202, or infer the existence of an oral agreement. Neugent, 149 N.C. App. at 45, 560 S.E.2d at 834 (citing N.C. Gen. Stat. § 25-2-204); Custom Molders, Inc. v. Roper Corp., 101 N.C. App. 606, 613, 401 S.E.2d 96, 100 (N.C. App. 1991). "A course of performance . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." N.C. Gen. Stat. § 25-1-303(d). In the absence of an explicit written agreement, courts have relied on the parties' course of performance to infer the existence of an oral contract. Custom Molders, 101 N.C. App. at 613, 401 S.E.2d at 100.

"The elements of a claim for breach of contract are: (1) existence of a valid contract; and (2) breach of the terms of the contract." B.E.E. Int'l, Ltd. v. Hawes, 381 F. Supp. 2d 488, 493 (M.D.N.C. 2005) (citing Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)). Under Article 2, "[t]he buyer must pay at the contract rate for any goods accepted." N.C. Gen. Stat. § 25-2-607(1). A seller may bring an action to recover damages where a buyer fails to pay a contractual amount as it becomes due. Id. §§ 25-2-703, 25-2-709(1). However, a buyer may revoke acceptance of goods if (1) the nonconformity "substantially

impairs" the value of the goods and (2) the buyer accepted the goods without knowledge of the nonconformity and "his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." Id. § 25-2-608(1). The buyer must revoke his acceptance "within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in the goods which is not caused by its own defects." Id. § 25-2-608(2).

Where a buyer has accepted goods and provided the seller with adequate notification of the breach, the buyer "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Id. § 25-2-714(1). The "nonconformity" refers to not only a breach of warranty, but also any failure on the part of the seller to perform his obligations under the agreement. Id. § 25-2-714, cmt. 2. Consistent with the buyer's right to damages, a buyer may notify the seller of his intention to "deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." Id. § 25-2-717.

## 2. Benchmark's Breach of Contract Claim

Here, the court finds that the LOA and accompanying documents support the existence of an enforceable agreement, particularly when viewed in conjunction with the parties' course of performance.

24

Even though the LOA represents the only formal written agreement between the parties, the RFQ and related documents indicate the parties' intention to enter into an agreement for the manufacture, testing, packaging, and shipping of the Bengal products, including the LED boards. From the outset, the parties agreed on a price for the LED boards in question, set forth explicit specifications for their manufacture, and provided for the procurement of the necessary materials to complete the project.

Cree concedes that "the LOA is a valid, enforceable, and binding contract between the parties." (Doc. 8 ¶ 32.) The LOA expressly provides for the provision and payment of the services that Benchmark seeks to recover. (Doc. 26-4.) Apart from Cree's counterclaim associated with the claimed scrap rate, Cree does not dispute the amount claimed by Benchmark for those services. (See Doc. 26-1 at 31-33; Doc. 26-5 at 1.) Cree contends, nevertheless, that it is excused from paying on the grounds that Benchmark materially breached the agreement. (Doc. 29 at 13-14.)

There is no genuine dispute as to whether Benchmark is entitled to recover on its breach of contract claim. Given that Cree did not express an intent to return any LED boards or provide evidence that it otherwise repudiated the parties' agreement prior to incurring liability for the amounts at issue, Cree's remedy under its counterclaim is either an offset to Benchmark's claim or for additional damages. N.C. Gen. Stat. §§ 25-2-714(1), 25-2-

717.[21]  Therefore, Benchmark is entitled to summary judgment as to its breach of contract claim.  Further, because there can be no unjust enrichment claim where there is an express agreement on the same subject matter, Cree's motion to dismiss Benchmark's claim in the alternative for unjust enrichment (second cause of action) will be granted.  Whitfield v. Gilchrist, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998).

### 3.  Cree's Breach of Contract Counterclaim

Cree argues that Benchmark breached the parties' agreement by exceeding an agreed-upon "scrap allowance" of 0.5% for the consigned LED bulbs used in the manufacture of the lighting products and failing to compensate Cree for this "Additional Scrap" and the remaining inventory of consigned LED bulbs retained by Benchmark.  (Doc. 8 ¶ 61-63.)  Cree seeks to recover $2,868,921, which it contends represents the cost of (1) 1,607,518 XT-E LED

---

[21] While the tender of LED boards is not necessarily required for Cree to revoke its acceptance of the goods, Roy Burt Enterprises, Inc. v. Marsh, 328 N.C. 262, 264, 400 S.E.2d 425, 427 (1991), Cree has not alleged that it intended to return the LED boards or otherwise revoke its acceptance of the allegedly defective goods, but rather only sought to offset its damages associated with Benchmark's alleged breach of contract.  Cree's reliance on cases involving anticipatory repudiation is misplaced, as the evidence indicates that it failed to reject the goods in question and continued to induce Benchmark to perform under the parties' agreement.  See Millis Const. Co. v. Fairfield Sapphire Valley, Inc., 86 N.C. App. 506, 512, 358 S.E.2d 566, 570 (1987) ("The issue of anticipatory breach does not affect defendant's obligation under its contracts to pay for work performed, invoiced and approved as of the date . . . where defendant alleges plaintiff anticipatorily breached its contracts with defendant.")

bulbs and 4,394,757 XB-G LED bulbs Benchmark allegedly scrapped in excess of the parties' "scrap allowance," and (2) 395,022 XT-E LEDs and 199,558 XB-G LEDs Benchmark allegedly retained following the conclusion of the parties' relationship. (Id. ¶¶ 57-64.)[22] While Cree concedes that the alleged "scrap rate" is not provided for in the LOA or draft CMA, it argues that the agreement was subject to a 0.5% allowance based on the parties' conduct. (Doc. 8 ¶ 24; Doc. 29 at 9-11.) Cree relies on the communications between the parties regarding the attrition rate of LED bulbs, particularly those surrounding Benchmark's weekly and monthly inventory reports. (Doc. 35 at 2-3, 7-9.) Cree also relies on the fact that the draft CMA placed the risk of loss on Benchmark for consigned LEDs in its possession. (Doc. 35 at 3-4; Doc. 29-3 at 76.) Each party has moved for summary judgment as to Cree's breach of contract counterclaim.

When viewed in the light most favorable to Cree, the evidence creates a genuine dispute as to whether the parties agreed to risk of loss and a scrap rate for the consigned LED bulbs. As Cree concedes, the parties never entered any written agreement as to any designated scrap rate. (Doc. 32 at 11.) Even though the LOA contains a merger clause, the parties' contemplation of a later

---

[22] Cree alleges that the price of $0.5684 for each XT-E LED bulb and $0.3767 for each XB-G LED bulb. (Doc. 8 ¶ 55-56.) However, Cree concedes that the there is a genuine dispute of material fact as to the price of the LED bulbs in question. (Doc. 35 at 2.)

writing to serve as the complete integration of their agreement
avoids the application of the parol evidence rule that might
otherwise preclude the admission of evidence on this issue. <u>York
v. Health Mgmt. Assocs., Inc.</u>, No. 5:10-CV-00094-RLV, 2013 WL
636914, at *6 (W.D.N.C. Feb. 20, 2013). In addition, neither the
RFQ nor the draft CMA provided for a designated attrition or scrap
rate. (Doc. 26-1 at 42; Doc. 32-3 at 76.))[23]

During the parties' two-year relationship, Cree permitted
attrition rates in excess of this alleged rate on multiple
occasions. (Doc. 8, ¶¶ 23-24; Doc. 26-1 at 21-22.)[24] Cree also
consistently communicated a "zero cost" of the consigned LED bulbs
in its bill of materials (Doc. 27-20 at 56, 58-59) and never sought
to recover the cost of bulbs that exceeded the alleged scrap rate
(Doc. 26-1 at 16, 116; <u>see</u> Doc. 25 at 20-21).

However, a reasonable factfinder could conclude that the
parties' course of performance indicates that they intended for

---

[23] Cree also points to the fact that the RFQ included a per-unit LED
board price that included a line item for "Scrap (and other [Material
Overhead])." (Doc. 27-20 at 33, 36-38.) However, Cree admits that it
communicated a "zero cost" for the consigned LEDs for the RFQ submission.
(Doc. 26-1 at 38-39.) Even though Benchmark did factor the cost of the
LEDs into its calculation of material overhead, Benchmark claims it
developed a costing model with a zero attrition rate for the consigned
LEDs. (Doc. 26-1 at 41-42, 55, 96-97.)

[24] It is unclear how Cree accounted for those instances it contends it
forgave Benchmark's obligation to pay for scrap, when it seeks to recover
the total number of LEDs contained in the final "delta" report issued
by Benchmark. (<u>See</u> Doc. 25 at 8; Doc. 27-21 ¶ 11 (noting the "delta"
reports did not account for instances in which Cree "forgave" the alleged
scrap rate).)

Benchmark to assume the risk of loss for the consigned LED bulbs in its possession. The draft CMA submitted by Benchmark provided that it would assume the risk for the loss of consigned LED bulbs in its possession "for any reason." (Doc. 29-3 at 76.) The parties also agreed that Benchmark would file regular inventory reports and keep Cree apprised of its consigned inventory of LED bulbs. (See Doc. 27-20 at 120, 166 (noting "as of May 2013, there was an established delta report and process for reporting delta going forward for the [XT-E and XB-G LEDs]"); Doc. 26-1 at 117-21.) Beginning in at least April of 2013, Cree communicated to Benchmark on several occasions that it should attempt to achieve a scrap rate of 0.5%. (See Doc. 34 at 6; Doc. 26-1 at 94-96; Doc. 35-3 at 88-91, 110, 114.)[25] These communications, when coupled with Benchmark's assumption of the risk of loss, raise a genuine dispute of fact as to whether the parties entered into an agreement as to risk of loss and a scrap rate allowance. Therefore, neither party is entitled to summary judgment as to Cree's counterclaim, and their cross motions will be denied.

---

[25] In his declaration, Stevens avers that "at an early meeting commencing the relationship between Cree and Benchmark, I recall that my colleague at the time, Neal Hunter, communicated that Cree expected Benchmark to adhere to a 0.5% scrap allowance . . . ." (Doc. 32-2 ¶ 20.) However, this is inadmissible hearsay. See Maryland Highways Contractors Ass'n, Inc. v. State of Md., 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."); Design Res., Inc. v. Leather Indus. of Am., No. 1:10CV157, 2014 WL 4159991, at *6 (M.D.N.C. Aug. 19, 2014), aff'd, 789 F.3d 495 (4th Cir. 2015).

### C. Cree's Breach of Good Faith and Fair Dealing Counterclaim

Cree also alleges that Benchmark's conduct constitutes a breach of the implied duty of good faith and fair dealing. While the parties are subject to an implied covenant of good faith and fair dealing, N.C. Gen. Stat. § 25-1-304, courts have recognized that this cause of action is "simply another way of stating a claim for breach of contract." Home Meridian Int'l, Inc. v. Longnecker, No. 1:12CV1093, 2014 WL 2257194, at *9 (M.D.N.C. May 29, 2014) (quoting Ada Liss Grp. v. Sara Lee Corp., No. 06CV610, 2010 WL 3910433, at *14 (M.D.N.C. Apr. 27, 2010)).[26] Given that Cree has raised a genuine dispute as to whether Benchmark breached the agreement, neither party is entitled to summary judgment as to this counterclaim. Cf. Suntrust Bank v. Bryant/Sutphin Properties, LLC, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (2012) ("As the jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts.")

### D. Cree's UDTPA Counterclaim

In addition to seeking to recover under a breach of contract theory, Cree alleges that Benchmark's failure to adequately

---

[26] Courts have considered such claims independently where a special relationship between the parties exists. Home Meridian, 2014 WL 2257194, at *9. However, neither party disputes that these two claims should be considered together in this instance. (Doc. 32 at 15.)

disclose the full amount of the scrapped LED bulbs constitutes a violation of the UDTPA. (Doc. 8 ¶ 72.) Cree argues that Benchmark's use of a "delta" calculation in its inventory reports misled Cree as to the true amount of scrapped LED bulbs.[27] Benchmark contends that Cree has failed to allege sufficient aggravating circumstances to support such a claim. (Doc. 24 at 5; Doc. 25 at 13.)

To prevail on a claim under the UDTPA, a party must establish "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Home Meridian, 2014 WL 2257194, at *7 (quoting Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001)). While a UDTPA claim need not be based on fraud, bad faith, or actual deception, a party must show that a "defendant's acts possessed the tendency or capacity to mislead or created the likelihood of deception" when viewed from the perspective of the "average businessperson." RD

_____

[27] While Cree challenges Benchmark's "substandard accounting and inventory tracking practices" (Doc. 35 at 6), Cree does not directly dispute the accuracy of the baseline figures provided in the weekly and monthly reports it received regarding the LED bulbs at issue. Cree admits that Benchmark accurately reported the number of scrapped XT-E LED bulbs through May of 2013 (Doc. 32-2 ¶ 36) and seeks to recover the exact number of consigned XT-E and XB-G LED bulbs listed in Benchmark's final 2015 "Delta" report. (Compare Doc. 8 ¶ 42 with Doc. 27-21 at 8.) In light of Cree's admission that Benchmark accurately reported the number of scrapped XT-E LED bulbs through May of 2013 (Doc. 32-2 ¶ 36), it is unclear to what extent Benchmark misrepresented the number of scrapped XT-E LED bulbs, given that those bulbs were phased out entirely in June of 2013 (Doc. 29-3 at 121).

& J Properties v. Lauralea-Dilton Enterprises, LLC, 165 N.C. App. 737, 748, 600 S.E.2d 492, 501 (2004). A "simple breach of contract or failure to pay a debt do not qualify as unfair or deceptive acts, but rather must be characterized by some type of egregious or aggravating circumstances before the statute applies." Pan-Am. Prod. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 700 (M.D.N.C. 2011) (quoting Norman Owen Trucking, Inc. v. Morkoski, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998)).

Even if Benchmark's conduct amounted to a breach of contract, Cree fails to demonstrate sufficient aggravating circumstances to support such a claim. The parties acknowledge that the term "delta" has no standard meaning within the industry. (Doc. 27-22 at 212; Doc. 32-2 ¶ 28.) Even though Benchmark apparently assigned two different meanings to the term within the May 2013 Final Reconciliation Report, Cree had adequate information to understand its meaning in the weekly reports.[28] As Benchmark notes, Cree was

---

[28] Cree contends that Benchmark's accounting and management of its consigned LED inventory was substandard and not in accordance with industry standards, relying on the instance in which a Benchmark employee suggested weighing the scrapped LED bulbs as well as Clemons's admission during Benchmark's Rule 30(b)(6) deposition that he was unable to recall using this form of accounting with any of its other customers. (Doc. 27-20 at 31, 139; Doc. 29 at 6.) Cree similarly relies on internal emails from Benchmark which indicated that some employees questioned whether the "delta" figure was being calculated correctly. (Doc. 29 at 9; Doc. 27-20 at 158-59, 164-66.) However, Clemons subsequently clarified in a sworn statement that his questions did not in fact relate to the calculation of the "delta" figure, but a separate attrition report unrelated to the "Delta" report. (Doc. 31-1 ¶ 9 (citing Doc. 27-20 at 165-66).)

also provided with all of the information it needed to calculate the number of LED bulbs that had been scrapped. (Doc. 25 at 13-14; Doc. 27-13; Doc. 26-1 at 115-16.)[29] Cree further admits that the formula for calculating the "delta" figure was defined within the Excel spreadsheet of each weekly IRR Report that Cree received. (Doc. 26-1 at 119.) Although Cree contends that Benchmark never properly defined the meaning of "delta" within these reports, it does not identify a single instance in which any Cree employee ever inquired about the "delta" figure until over a year after Cree had been regularly receiving such reports. (Doc. 26-1 at 120; see Doc. 27-20 at 129.)

Consequently, Cree has failed to demonstrate that Benchmark's alleged misrepresentations were "likely to deceive" the "average business person." See Angell v. Kelly, No. 1:01CV00435, 2006 WL 3479010, at *10 (M.D.N.C. Nov. 30, 2006) (granting summary judgment on plaintiff's UDTPA claim and finding plaintiffs were unreasonable in relying on defendant's misrepresentations where

---

[29] Cree relies on the fact that the presentation attached to an internal Cree email discussing the "delta" calculation references two separate "delta" values. (Doc. 32 at 8; Doc. 27-13 at 4.) The May 2013 report does not provide an identical explanation for the "delta" figure, but the report was sufficient to place Cree on notice regarding the bulbs in question, particularly considering that the accuracy of the underlying figures was not called into question. (Compare Doc. 27-13 at 4 (May 2013 presentation calculating 6.0% "DELTA" figure based on combination of smaller 4.0% "delta" figure and 2.0% attrition rate) with Doc. 27-21 at 8 (final report prepared in January of 2015 calculating "delta" figure with reference to "rework and attrition" and a separate category for "scrap history").)

the plaintiffs failed to conduct adequate due diligence prior to sale or consult publicly available documents that demonstrated the defendant's misrepresentations to be false).   The court will therefore grant Benchmark's motion for summary judgment on this counterclaim.

### E.   Cree's Unjust Enrichment Counterclaim

In the alternative to its breach of contract counterclaim, Cree contends that it is entitled to recover the cost of damaged LED bulbs in excess of the scrap rate under the theory of unjust enrichment.  (Doc. 29 at 14.)  Benchmark argues that Cree's claim fails as a matter of law because the parties had a contract and Cree failed to demonstrate that the parties understood the LED components were provided with the expectation of payment.  (Doc. 25 at 29; Doc. 31 at 14.)

"Under North Carolina law, 'unjust enrichment is a claim in quasi contract or contract implied in law which arises when a party confers a benefit upon another which is not required by a contract either express or implied [in fact] or a legal duty [and] the recipient thereof is . . . unjustly enriched and [is] required to make restitution therefor.'"  <u>Ernst v. N. Am. Co. for Life & Health Ins.</u>, 245 F. Supp. 3d 680, 691 (M.D.N.C. 2017) (quoting <u>M Series Rebuild, LLC v. Town of Mount Pleasant</u>, 222 N.C. App. 59, 67, 730 S.E.2d 254, 260 (2012)).  In order to establish a claim for unjust enrichment in North Carolina, a plaintiff must show that "(1)

plaintiff conferred a measurable benefit to defendant, (2) defendant knowingly and voluntarily accepted the benefit, and (3) the benefit was not given gratuitously." TSC Research LLC v. Bayer Chems. Corp., 552 F. Supp. 2d 534, 540 (M.D.N.C. 2008). "However, [m]ore must be shown than that one party voluntarily benefited another or his property. Indeed, the mere fact that one party was enriched, even at the expense of the other, does not bring the doctrine of unjust enrichment into play. There must be some added ingredients to invoke the unjust enrichment doctrine." Crump v. City of Hickory, 240 N.C. App. 602, 772 S.E.2d 873 (2015) (internal citations and quotation marks omitted).

An unjust enrichment claim requires a showing that both parties understood the service or benefit was given with an expectation of payment at the time it was provided. Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., 243 F. Supp. 2d 386, 412 (M.D.N.C. 2003) (citing Scott v. United Carolina Bank, 130 N.C. App. 426, 429, 503 S.E.2d 149, 152 (1998)). "The law creates a presumption that an expectation of payment exists unless 'the services are rendered gratuitously or in discharge of some obligation.'" Id. (emphasis removed) (quoting Atlantic Coast Line R. Co. v. State Highway Commission, 268 N.C. 92, 96, 150 S.E.2d 70, 73 (1966)). A contract implied in law cannot be asserted where there is an express agreement between the parties, unless there is a clear indication the parties abandoned the contract and no longer

intended to be bound by it. See <u>Triad Packaging, Inc. v.</u> <u>SupplyOne, Inc.</u>, 925 F. Supp. 2d 774, 787-89 (W.D.N.C. 2013), <u>aff'd</u>, 597 F. App'x 734 (4th Cir. 2015); <u>Geoscience Grp.,</u> <u>Inc. v. Waters Const. Co.</u>, 234 N.C. App. 680, 690, 759 S.E.2d 696, 702 (2014).

Here, if the factfinder concludes that the parties entered into an express agreement as to risk of loss and scrap rate, this claim would be barred as a matter of law. <u>Triad Packaging</u>, 925 F. Supp. 2d at 789. Benchmark contends alternatively that Cree has not offered proof that the LED bulbs were consigned to it with an expectation of payment. (Doc. 25 at 29-30.) Benchmark relies on evidence that Cree communicated a zero cost for the bulbs during the relationship and never communicated how billings for the bulbs would occur. (<u>Id.</u>) However, the bulbs were delivered to Benchmark on consignment such that there would be an expectation that Benchmark would not be permitted to keep them without cost. Moreover, there is some evidence that the bulbs were rendered with an expectation of payment if they were retained insofar as Benchmark attributed a value to the bulbs as part of its calculation of material overhead. (Doc. 27-21 ¶ 5; Doc. 27-20 at 40-41.) Thus, assuming (without deciding) that the claim could legally proceed, there is a genuine dispute whether Benchmark understood that if it retained the bulbs it would have to pay Cree their reasonable value.

Therefore, the parties' cross motions for summary judgment as to this counterclaim will be denied.

## F.  Cree's Conversion Counterclaim

Finally, Cree alleges that Benchmark retained, and refused to return, 395,022 XT-E LED bulbs and 199,588 XB-G LED bulbs of inventory on hand.  (Doc. 8 ¶¶ 50, 83.)  In support of its motion for summary judgment, Benchmark contends that it returned the XT-E LED bulbs in 2014 (Doc. 27-21 ¶ 13), and Cree refused to accept shipment of the XB-G bulbs in June of 2015 (Doc. 27-21 ¶ 12). Benchmark relies on sworn statements to this effect.  (Doc. 27-21 ¶¶ 12-13.)  Cree has proffered two declarations that simply state that Benchmark has retained the inventory in question.  (Doc. 29-3 ¶ 46; Doc. 32-2 ¶ 47.)

"The elements of conversion are: (1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; and (4) to the exclusion of the rights of the true owner." B.E.E. Int'l, Ltd. v. Hawes, 381 F. Supp. 2d 488, 493 (M.D.N.C. 2005) (citing Peed v. Burleson's, Inc., 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). "[W]hen the defendant lawfully obtains possession or control and then exercises unauthorized dominion or control over the property, demand and refusal become necessary elements of the tort." Stratton v. Royal Bank of Canada, 211 N.C. App. 78, 83, 712 S.E.2d 221, 227 (2011) (citations omitted).  Proof of the

surrender of the chattel is a complete defense to a conversion claim. <u>Herring v. Creech</u>, 241 N.C. 233, 237, 84 S.E.2d 886, 889 (1954).

Here, it is undisputed that Cree owns the LED bulbs in question and Benchmark lawfully obtained possession of them. Benchmark has provided evidence that it returned the XT-E bulbs. Cree argues in its briefing that the shipment of XT-E bulbs in 2014 "did not contain LEDs, but rather an assortment of other equipment and material from Benchmark's facility that Cree was unable to identify." (Doc. 32 at 10.) Cree argues in its briefing that Benchmark's shipping slips do not match the inventory in question (Doc. 32 at 18-19),[30] but the only <u>evidence</u> Cree offers to support this claim are two declarations that state under oath that Benchmark "has retained" the XT-E LED bulbs. (Doc. 29-3 ¶ 46; Doc. 32-2 ¶ 47.) However, in addition to this is evidence that during settlement discussions required by the LOA, Benchmark noted that the "XTE return shipment" remained a "disputed item" between the parties. (Doc. 29-3 at 119.) A spreadsheet attached to an email dated March of 2014 similarly lists the 395,022 XT-E bulbs

---

[30] Cree does not cite to any part of the record containing admissible evidence for that claim, nor has the court found any in its review of the deposition testimony, <u>see</u> L.R. 7.2(a)(2) ("Each statement of fact should be supported by reference to a part of the official record in the case."); <u>Youse v. Duke Energy Corp.</u>, No. 1:02CV00808, 2003 WL 27356582, at *3 (M.D.N.C. Dec. 15, 2003) ("The Court will not consider as a 'fact' any statement in Plaintiff's facts which is either argumentative or unaccompanied by a record citation.")

as "Unaccounted LEDs" for which Cree sought compensation (Doc. 29-3 at 131; Doc. 32-2 at 126.)  While general in nature and thin proof, this testimony and evidence, when construed in the light most favorable to Cree, suffices to create a genuine dispute of fact as to whether Benchmark converted the XT-E bulbs in question. Cf. Griffith v. Glen Wood Co., 184 N.C. App. 206, 214, 646 S.E.2d 550, 556 (2007) ("If the defendant's refusal to return the goods is not expressed, it may be implied from the defendant's conduct." (citing Restatement (Second) of Torts § 237 cmt. g (Am. Law Inst. 1965).)[31]

As to the XB-G bulbs, in contrast, while Cree similarly relies on the same two affidavits that Benchmark "has retained" them (Doc. 32-2 ¶ 47; Doc. 29-3 ¶ 46), Benchmark has provided sworn testimony that it offered to return the bulbs in June 2015 but that Cree refused to accept them.  (Doc. 27-21 ¶ 12.)  Cree provides no evidentiary response to Benchmark's sworn testimony.  Cree's affidavits that simply state that Benchmark retains the bulbs is not inconsistent with Benchmark's evidence that it does so because its offer to return them was refused.  Thus, Cree fails to refute this claim. (Doc. 27-21 ¶ 12; id. at 10.)  The court will therefore

---

[31] Benchmark notes that in Cree's Rule 30(b)(6) deposition, Power could not say whether Cree demanded the return of the XT-E LED bulbs following the transition to XB-G LED bulbs in May of 2013.  (Doc. 25 at 27; Doc. 26-1 at 112.)  But Benchmark does not address whether the allegations of Cree's counterclaim can nevertheless be construed as a demand for return of the bulbs, and the court will decline to grant the motion for summary judgment to the extent it rests on this ground.

grant Benchmark's motion for summary judgment as to Cree's conversion counterclaim as to the XB-G bulbs because Cree has failed to establish a genuine dispute of fact as to it.

## III. CONCLUSION

For the reasons set forth above,

IT IS THEREFORE ORDERED as follows:

1. Benchmark's motion for summary judgment (Doc. 24) is GRANTED with respect to its breach of contract claim (first cause of action), and Benchmark shall have and recover the following from Cree: (1) $587,229.06 in unpaid invoices plus interest; (2) $286,371.44 for excess and obsolete components plus interest; and (3) $457,105.38 for excess amounts paid for consigned components plus interest, with interest on these sums accruing from the date the complaint was filed, May 25, 2016.

2. Benchmark's motion for summary (Doc. 24) is GRANTED as to Cree's counterclaims for violation of the UDTPA (third claim for relief), and GRANTED IN PART as to Cree's counterclaim for conversion as to the XB-G LED bulbs (fourth claim for relief), and those claims are DISMISSED WITH PREJUDICE. Benchmark's motion for summary judgment is otherwise DENIED.

3. Cree's motion for partial summary judgment (Doc. 28) is GRANTED as to Benchmark's alternative claim for unjust enrichment (second cause of action) and DENIED as to Benchmark's contract claim (first cause of action) as well as to Cree's breach of

contract counterclaim (first claim for relief), Cree's unjust enrichment counterclaim (third claim for relief), and Cree's breach of the covenant of good faith and fair dealing counterclaim (second claim for relief). The action will proceed to trial on Cree's counterclaims for breach of contract (first claim for relief), breach of the covenant of good faith and fair dealing (second claim for relief), unjust enrichment (fifth claim for relief, in the alternative), and conversion as to the XT-E LED bulbs (fourth claim for relief).


                                        /s/    Thomas D. Schroeder
                                        United States District Judge

January 18, 2018