IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


BENCHMARK ELECTRONICS, INC.,      )
and BENCHMARK ELECTRONICS DE      )
MEXICO, S. DE R.L. DE C.V.,       )
                                  )
            Plaintiffs,           )
                                  )
      v.                          )      1:16CV529
                                  )
CREE, INC.,                       )
                                  )
            Defendant.            )


**MEMORANDUM OPINION AND ORDER**


**OSTEEN, JR., District Judge**

　　Presently before the court is a post-judgment motion filed

by counterclaim plaintiff Cree, Inc. ("Cree") seeking to amend

or alter the judgment pursuant to Fed. R. Civ. P. 52(a), 54(c)

and 59(e) and, alternatively, requesting a new trial pursuant to

Fed. R. Civ. P. 59(a). (Doc. 61.) Counterclaim defendants

Benchmark Electronics, Inc. and Benchmark Electronics de Mexico,

S. de R.L. de C.V. (collectively, "Benchmark") have responded in

opposition, (Doc. 65), and Cree has filed a reply, (Doc. 67).

Cree's motion is now ripe for resolution, and, for the reasons

stated herein, Cree's motion will be denied.

## I. <u>BACKGROUND & ARGUMENTS</u>

On June 27, 2018, judgment was entered in favor of Benchmark on its claim for breach of contract, against Benchmark on its unjust enrichment claim, and against Cree on all of its counterclaims, including breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, violation of the Unfair and Deceptive Trade Practices Act ("UDTPA"), and conversion. (<u>See</u> Doc. 57.)

Cree's motion asks this court "to correct evidentiary and legal errors" and find that Cree proved Benchmark's liability for conversion and breach of contract or, in the alternative, unjust enrichment. (Cree's Mem. in Supp. of Mot. to Am. or Alter Judg. ("Cree's Mem.") (Doc. 62) at 5.) Cree contends that it "prov[ed] the essential terms of a bailment contract." (<u>Id.</u> at 6.) As a result, Cree also argues that the parties had a "special relationship" as generally required to prevail on a claim for breach of the covenant of good faith and fair dealing. (<u>Id.</u> at 7-8.)

Alternatively, Cree asserts that it "put on evidence of industry standards regarding maximum allowable scrap in the parties' agreement" and the court erred in finding that Cree did not prove the existence of such an industry standard that would be "presumptively included" in the contract. (<u>See id.</u> at 6, 8–

-2-

10.) Even if such a standard was not presumptively included,
Cree contends it proved that a maximum allowable scrap rate is a
"background norm" that automatically constitutes part of the
parties' agreement unless it is specifically renounced. (Id. at
10-11.)

Next, Cree argues that this court's conclusion that there
is no industry standard of imposing financial liability for
scrap above a certain rate belies common sense and is
contradicted by "unrebutted testimony . . . that the purpose of
having a maximum allowable component scrap rate is to reduce the
cost to the contract manufacturer of manufacturing finished
goods." (Id. at 11.) Cree states that, because Benchmark
received documents listing the cost incurred by Cree for each
LED, this court should "amend its findings to hold that
Benchmark understood that the LEDs that it scrapped in excess of
the maximum allowable rate had value for which Benchmark would
be liable to Cree." (Id. at 12-13.)

Cree further argues that Calvin Clemons, Benchmark's
witness, lacked direct knowledge regarding Benchmark's reporting
and that "Clemons' lack of personal knowledge of the subjects of
his testimony — notwithstanding its proven inconsistency — is
fatal to his credibility." (Id. at 14-15.) Cree, having asserted
that this court erred in not finding a contractual agreement

regarding maximum allowable scrap rate, argues that this court "implie[d]" that Cree had waived Benchmark's breach, when Cree could not have waived this breach because "Benchmark did not report excessive scrap of XB-G LEDs until the last two months of the parties' relationship . . . ." (Id. at 15-17.)

As to Cree's unjust enrichment claim, Cree contends that "Benchmark did not overcome the presumption that Cree expected payment for its LEDs." (Id. at 17.) Cree also argues that "the fact that the parties mutually referred to their agreement as a 'consignment' is compelling evidence that Cree expected payment for its consigned goods, either in the form of LEDs returned to it in finished goods or money." (Id. at 18.) Next, Cree argues that this court based "its unjust enrichment conclusions on a finding that Cree did not expect payment for consigned LEDs until the end of the parties' relationship . . . ." (Id. at 19.) Cree claims that this finding is unsupported by any evidence and that Cree simply did not know it had any right to payment until it became aware of the high scrap rate. (Id. at 19-20.)

Finally, Cree contends that the court erred in dismissing Cree's conversion claim because the court's finding was unsupported by the evidence. (Id. at 20.) Cree contends that Benchmark's shipping documentation is "unreliable" and that "[t]he only reasonable conclusion is that the shipment did not

contain individual LEDs, but instead finished goods." (Id. at 21-22.) Cree also contends that this court should disregard any explanation based on "frozen" reporting because Clemons lacked personal knowledge. (Id. at 22.)

Benchmark argues in response that this court correctly determined that Cree did not show an industry-wide maximum scrap rate that would be automatically included in the contract. (Doc. 65 at 8-9.) Next, Benchmark argues that Cree is barred from asserting any bailment-based claim at this stage because the claim was not properly pled; even if Cree could assert this claim, Benchmark contends that it must fail because it is an attempt to impose tort liability based on the breach of a contractual agreement. (Id. at 10-12.) Benchmark further argues that Cree's bailment argument is precluded by contributory negligence because "Cree admits that it also contributed to the higher scrap rates." (Id. at 12.) Finally, Benchmark asserts that this court correctly dismissed Cree's UDTPA, unjust enrichment and conversion claims in its original post-trial order. (Id. at 12-17.)

In reply, Cree asserts that it is entitled to recover in either contract or tort if the court found the necessary elements of a bailment, "even if the legal theory upon which the Court enters judgment is different than that which Cree included

in its complaint." (Doc. 67 at 7–8.) Cree further argues that it

cannot be held contributorily negligent because it took

reasonable steps to address manufacturing issues that increased

the scrap rate and because these issues did not meaningfully

impact the rate itself. (Id. at 8–9.) Finally, Cree asserts that

its unjust enrichment claim was wrongfully dismissed because

"Cree demonstrated that it provided valuable goods[,] . . .

Benchmark understood it was responsible for[] payment for wasted

LEDs" and Benchmark did not present conclusive evidence

regarding its return of any LEDs. (Id. at 11–12.)

## II.  LEGAL STANDARDS

### A.  Rules 59(e) & 52(b)[1]

Rule 59(e) of the Federal Rules of Civil Procedure provides

for a motion to alter or amend a judgment. Rule 59(e) "permits a

district court to correct its own errors, 'sparing the parties

and the appellate courts the burden of unnecessary appellate

proceedings.'" Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148

F.3d 396, 403 (4th Cir. 1998) (quoting Russell v. Delco Remy

Div. of Gen. Motors Corp., 51 F.3d 746, 749 (7th Cir. 1995)).

"Rule 59(e) motions will be granted in three circumstances: (1)

to accommodate an intervening change in controlling law; (2) to

---

[1] Cree asks this court to amend its findings pursuant to
Rule 52(a), but Rule 52(b) governs amended findings.

account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 197 (4th Cir. 2006) (citation and internal quotation marks omitted). "In general reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." Pac. Ins. Co., 148 F.3d at 403 (citation omitted).

Rules 52(b) and 59(e) "together enable a court to amend its findings and conclusions made in conjunction with a bench trial and amend the judgment accordingly." Westchester Surplus Lines Ins. Co. v. Clancy & Theys Constr. Co., No. 5:12-CV-636-BR, 2015 WL 12803655, at *1 (E.D.N.C. Oct. 22, 2015); see also Fed. R. Civ. P. 52(b); Fed. R. Civ. P. 59(e). For example, after a bench trial, Rule 52(b) provides that "the court may amend its findings — or make additional findings — and may amend the judgment accordingly." Fed. R. Civ. P. 52(b). Neither rule permits a party "to relitigate old matters or to raise arguments that could have been raised prior to entry of the judgment from which relief is sought." Life Advocates, Inc. v. City of Asheville, 197 F.R.D. 562, 563 (W.D.N.C. 2000); accord Goodwin v. Cockrell, Civil Action No. 4:13-cv-199-F, 2015 WL 12851581, at *1 (E.D.N.C. Dec. 30, 2015).

**B.    Rule 54(c)**

Rule 54(c) "authorizes recovery under any theory supported by the facts proven at trial . . . 'even if the party has not demanded such relief in the party's pleadings.'" <u>Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond</u>, 80 F.3d 895, 900 (4th Cir. 1996) (quoting Fed. R. Civ. P. 54(c)). While Rule 54(c) permits recovery "without regard to errors in the pleadings, [it] does not allow the district court to award relief based on a theory that was not properly raised at trial, or to a party that has not prevailed." <u>Old Republic Ins. Co. v. Emp'rs Reinsurance Corp.</u>, 144 F.3d 1077, 1080 (7th Cir. 1998) (citations omitted). This rule "permits relief based on a particular theory of relief only if that theory was squarely presented and litigated by the parties at some stage or other of the proceedings." <u>Evans Prods. Co. v. W. Am. Ins. Co.</u>, 736 F.2d 920, 923 (3d Cir. 1984).

**C.    Rule 59(a)**

Under Rule 59(a), a district court must

> set aside the verdict and grant a new trial if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

<u>Knussman v. Maryland</u>, 272 F.3d 625, 639 (4th Cir. 2001) (citation omitted). A new trial may be granted "on all or some of the issues — and to any party . . . for any reason

for which a new trial has heretofore been granted in an
action at law in federal court." Fed. R. Civ. P. 59(a).
"[T]he district court may weigh evidence and assess
credibility in ruling on a motion for a new trial." <u>Wilhelm
v. Blue Bell, Inc.</u>, 773 F.2d 1429, 1433 (4th Cir. 1985).
However, "Rule 59 motions cannot be used to introduce new
evidence, tender new legal theories, or raise arguments
that could have been offered" during trial. <u>Parton v.
White</u>, 203 F.3d 552, 556 (8th Cir. 2000).

## III. <u>ANALYSIS</u>

This court has reviewed and considered the following:
(1) Cree's motion and assignments of error as well as Cree's
proposed amended findings of fact and conclusions of law,
(2) Benchmark's response, (3) Cree's reply, and (4) the original
Memorandum Opinion and Order. ("Mem. Op. & Order" (Doc. 56).)
Following this review, this court finds no basis upon which to
grant the extraordinary remedy of amending or altering the
judgment or granting a new trial.

### A.  <u>Summary of the Court's Original Findings</u>

This court previously found that the Bengal driver boards
project was a newly-formed manufacturing relationship between
Cree and Benchmark. (Mem. Op. & Order (Doc. 56) at 5-8.) The
parties entered into a written letter agreement that did not

address the issue of liability for scrap LEDS. (Id. at 12–13.) This court further found that, while scrap rates were discussed, they were discussed only in terms of aspirational targets or goals and not with the intent of creating a contract term imposing liability for scrap LEDs above a certain percentage. (Id. at 19.)

This court found that Cree did not meet "its burden of proving that the parties' conduct or communications reflected the existence of a contractual agreement of a half a percent scrap rate above which there would be financial liability and that this risk of loss was allocated to Benchmark." (Id. at 40.) While certain explicit contractual terms existed in the relationship, after consideration of all the evidence, this court did not and does not find that the parties ever mutually agreed (whether by communications or conduct) that Benchmark would be liable to Cree for scrap LEDs above a certain percentage of waste in the manufacturing process. In all candor, this court is not persuaded that Cree even considered seeking compensation for excessive scrap rates until after the relationship started and Cree became concerned with the scrap rates and related reporting by Benchmark. Although Cree suggests that this court implicitly found that Cree had waived any breach of contract, that is not correct. This court did not and does

not find a waiver of a contractual term; instead, this court finds that the alleged contractual term did not exist at all.

Alternatively, Cree argued at trial that a maximum allowance for scrap LEDs is a term established by relevant trade usage. However, as this court found, Cree's own director of engineering, David Power, testified that ordinarily any target attrition rate "would be outlined in the RFQ in the beginning of a project." (See Mem. Op. & Order (Doc. 56) at 41.) Here, there was no well-established custom between the parties because this was the first joint undertaking by Benchmark and Cree. Further, this court was not persuaded by Cree's evidence that any "usage of trade" existed within the industry regarding financial liability for scrap, such that it would presumptively apply to an agreement between Cree and Benchmark.

In short, Cree never transferred ownership of any LEDs to Benchmark. As a result, Cree retained liability for the risk of loss through manufacturing process scrap. This court did not and does not find that Cree transferred financial responsibility for scrap loss above a certain percentage to Benchmark, whether expressly, impliedly through party-specific custom, or through any industry usage of trade.

**B.**   **Existence of a Bailment Arrangement**

As to Cree's first assignment of error, this court disagrees with Cree's proposed legal conclusion that this court "found the elements of a bailment agreement" and that, "[a]s bailee, Benchmark was obligated to redeliver the LEDs to Cree at the termination of the agreement" and must financially compensate Cree for LEDs that it did not return. (Cree's Mem. (Doc. 62) at 6-7.) This court did reject any factual or legal conclusion that an LED consignment relationship existed as a matter of law. (Mem. Op. & Order (Doc. 56) at 13 n.10.) However, this finding does not by implication require this court to find that a bailment relationship existed between Cree and Benchmark or, relatedly, that Benchmark breached any bailment agreement.

Cree's allegations and evidence at trial were directed toward proving the alleged breach of a contractual term. The issue presented in this case was whether Benchmark's scrap LEDs exceeded an allowable amount under any contractual provision (express or implied), not whether Benchmark was negligent in handling LEDs or generating scrap LEDs. Cree (as the non-prevailing party) cannot successfully obtain relief via an amended judgment based on a new legal theory, such as bailment, even if this theory was proved at trial. See Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills, 141

F.3d 1284, 1286 (8th Cir. 1998) ("Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment."); Pearson v. Fair, 935 F.2d 401, 414 (1st Cir. 1991) ("[B]ecause final judgment was not rendered in appellants' favor, appellants were not entitled to any relief."). Nevertheless, this court will address the merits of Cree's argument.

This court does not find that a bailment existed between Cree and Benchmark. "To constitute a bailment . . . [t]here must be such a full transfer, actual or constructive, of the property to the bailee as to exclude the possession of the owner and all other persons and give the bailee for the time being the sole custody and control thereof." Wells v. West, 212 N.C. 656, 656, 194 S.E. 313, 315 (1937).

Here, Cree surrendered custody of the LEDs to Benchmark when Cree sent LEDs to Benchmark for the limited purpose of incorporating those LEDs into finished goods. However, Benchmark at all times remained obligated to use the LEDs only under the terms of its contracts with Cree; that is, for the purpose of manufacturing the Bengal driver boards. Further, while the parties clearly disagree about the financial implications of scrap above a certain rate, the parties undisputedly presupposed

that Benchmark would incur a certain amount of waste through scrap during the process. As a result, the terms and conditions of the relationship between Cree and Benchmark were set by the contractual agreement and subsequent conduct. Because the LED transfer was within the scope of the explicit contractual agreement between the parties, it was not a bailment arrangement that could give rise to tort liability. See Freeman v. Myers Auto. Serv. Co., 226 N.C. 736, 737–38, 40 S.E.2d 365, 366–67 (1946).

This court agrees with Benchmark that Cree neither pled nor proved a contract-based negligence claim under a bailment theory. As another district court explained:

> Under North Carolina law, a tort claim cannot ordinarily be founded on a failure by one party to a contract to carry out a contractual duty to another party to the contract. . . . [However], in contrast to most tort claims, a bailment claim can proceed in the face of a contract under North Carolina law because of its underlying common law basis. . . . [B]ecause the bailment standard is one of ordinary negligence, simple negligence claims duplicating duties under a contract may proceed only to the extent they are based on the bailment. Consequently, to the extent the negligence claims arise from obligations of the contract apart from the bailment, they are barred by the general prohibition against tort claims in contract actions.

Rush Indus., Inc. v. MWP Contractors, LLC, 1:08cv810, 2011 WL 13076759, at *3 (M.D.N.C. Mar. 3, 2011). To prove a prima facie negligence claim based on a bailment arrangement, the "bailor

[must] offer[] evidence tending to show or it is admitted that the property was delivered to the bailee; that the bailee accepted it and thereafter had possession and control of it; and that the bailee failed to return the property or returned it in a damaged condition." McKissick v. R. Connelly Jewelers, Inc., 41 N.C. App. 152, 155, 254 S.E.2d 211, 213 (1979).

Assuming arguendo that the LED transfer arrangement created a common-law duty on the part of Benchmark to return scrap LEDs, this court is not persuaded that Benchmark breached that duty and was negligent in storing and manufacturing the Bengal boards. To the contrary, scrap LEDs were the result of problems in the manufacturing process attributable to both Cree and Benchmark. (Mem. Op. & Order (Doc. 56) at 17–18.) This court thus finds that Cree was potentially contributorily negligent in producing scrap and thus barred from recovering on a negligence theory. See, e.g., Davis v. Hulsing Enters., LLC, 370 N.C. 455, 458, 810 S.E.2d 203, 205–06 (2018); (see also Mem. Op. & Order (Doc. 56) at 18 (noting that "Cree sent Benchmark non-conforming goods").)

Further, it is clear from the record that some amount of scrap was anticipated by both parties at the outset. The acceptable limit on scrap LEDs — whether 0.5%, as Cree contends, or some higher percentage — is the critical factor to determine

-15-

whether Benchmark was negligent in failing to return scrap LEDs. This court found that Cree's evidence suggested only "a target rather than a contractual limit" of 0.5%. (Mem. Op. & Order (Doc. 56) at 19 n.13.) Based on that finding, this court does not believe that the 0.5% target can be used to conclusively determine whether Benchmark was negligent as a matter of law.

Therefore, Cree has failed to carry its burden of establishing that Benchmark was negligent in engaging in a manufacturing process that resulted in a scrap rate greater than 0.5%, where the parties clearly anticipated that some LEDs would be scrapped and where such scrap was attributable to the actions of both Cree and Benchmark. Even if a prima facie case is proved, "the ultimate burden of proof of establishing actionable negligence against defendant is on plaintiff, and remains on it throughout the trial." <u>M.B. Haynes Elec. Corp. v. Justice Aero Co.</u>, 263 N.C. 437, 441, 139 S.E.2d 682, 685 (1965). Cree has not carried this burden, and this court finds Cree has failed to prove that Benchmark was negligent under a bailment theory.

## C. <u>Trade Usage and Scrap Rate</u>

As to Cree's second assignment of error, Cree contends that it presented extensive testimony proving an industry standard or at least a "background norm" of 0.5% maximum allowable component scrap rate in the electronics manufacturing industry and

"financial liability for excess scrap." (Cree's Mem. (Doc. 62) at 8-12.) After reviewing the testimony and evaluating the credibility of all witnesses, this court disagrees, for the same reasons already described in its Memorandum Opinion, that Cree has factually proven such an industry standard or background norm. See N.C. Gen. Stat. § 25-1-303(c) ("The existence and scope of such a usage must be proved as facts.").

Cree argues that there is no meaningful distinction between a scrap rate and financial liability for scrap; however, this argument misstates the court's findings. Specifically, as this court found, there is a distinction between a target scrap rate (whether arising from the parties' conduct or from an industry norm) and a contractual provision creating financial liability for Benchmark when the scrap rate rises above a certain level. In the first instance — a target scrap rate — Cree remains free to subsequently memorialize this goal (with Benchmark's acquiescence) or to terminate the contract if Benchmark is unable to perform in an acceptable manner, as ultimately occurred in this case. In the alternative, if maximum scrap rate is a contractual provision giving rise to liability, Cree may sue for breach of contract. This court found that 0.5% was an aspirational target, not a contractual provision.

This court has considered the testimony Cree highlights in its briefing. This court notes, however, that Cree ignores other testimony regarding how scrap rate or attrition affected Benchmark's cost. Clemons testified, for example, that certain manufacturing issues that caused increased attrition also increased Benchmark's costs because Benchmark would then have to undertake additional work to create the finished product. (See Trial Tr. Vol. 2 (Doc. 59) at 106:14-21.) This court, to the extent not previously discussed, finds this testimony both credible and compelling and incorporates it into the Memorandum Opinion. This court additionally declines to amend its findings to state that "Benchmark understood that the LEDs that it scrapped in excess of the maximum allowable rate had value for which Benchmark would be liable to Cree." (Cree's Mem. (Doc. 62) at 12-13.) The record shows that Benchmark, at Cree's direction, charged Cree a certain amount for storing and managing the LEDs that it sent to Benchmark and that the LEDs were provided to Benchmark at zero cost.

This court did not determine, and finds it unnecessary to determine now, what value should be assigned to the LEDs, as Cree has not prevailed and is not entitled to damages. Nevertheless, this court did find that "Cree supplied LEDs at zero cost to Benchmark." (Mem. Op. & Order (Doc. 56) at 14.)

This court further found that "Cree preferred this arrangement because . . . Cree did not want to share with a third party its cost to make LEDS, information Cree considered proprietary . . . ." (Id.) These facts further undermine Cree's claim that a contractual agreement existed requiring Benchmark to pay for excess scrap at the beginning of this contract. Cree did not want to disclose its costs, presumably a significant part of any contractual agreement to pay for excess scrap LEDs. As this court found, Cree intended to "optimize the price Cree paid for the finished product" and sought an aggressive quote from Benchmark because Benchmark would not have any carrying cost for purchasing the LEDs. (Id.) Not passing the financial risk of excessive scrap LEDs to Benchmark is consistent with Cree's intent to obtain an aggressive quote from Benchmark.

Next, Cree disputes the credibility of Calvin Clemons' testimony. (Cree's Mem. (Doc. 62) at 14–15.) This court has reviewed all the testimony and admitted exhibits. First, the record shows that Clemons was personally involved in negotiating the Bengal Project, attended the Bengal Project kickoff meeting, and communicated with Cree to discuss LED inventory value and attrition. (See, e.g., Doc. 62-4 at 74.) Second, contrary to Cree's argument implying that only Clemons described the scrap target rate as a "goal," (Cree's Mem. (Doc. 62) at 14), Clemons,

Stevens, and the reports themselves all variously described the rate as a target or goal. (See, e.g., Doc. 62-5 at 27.) While this court has weighed and evaluated the credibility of Clemons, Power, and Stevens as their testimony related to Benchmark's reporting, this court has also carefully reviewed the documents submitted as evidence in this case and finds nothing to suggest that Cree communicated a contractual scrap rate to Benchmark. Having found no contractual scrap rate, this court finds that no breach was possible. Cree's awareness is thus not relevant, and this court declines to adopt Cree's legal conclusion that Cree could not waive a breach of which it was unaware. (Cree's Mem. (Doc. 62) at 15-17.)

**D.  Unjust Enrichment**

Cree's next assignment of error concerns the court's finding that Cree did not expect payment for the LEDs as the services were rendered, or, in this case, as the LEDs were shipped to Benchmark for incorporation into finished goods. This court notes that, contrary to Cree's assertion, the record provides evidence that the LEDs were provided to Benchmark at "zero cost." (See, e.g., Doc. 62-1 at 26-27.) Cree argues, however, that there are "only two exceptions that overcome the presumption that Cree expected payment from Benchmark" for the LEDs: (1) a gift or gratuitous transfer, and (2) a shipment in

exchange for discharging Cree of an obligation found in another agreement between the parties. (Cree's Mem. (Doc. 62) at 18.)

This court disagrees that there is any default presumption that Cree expected payment from Benchmark for LEDs. First, any LEDs used in the driver boards were ultimately shipped back to Cree, and Cree was expected to pay for the finished board. Second, as this court found, Cree set the price that Benchmark billed Cree for storing and handling the LEDs, suggesting that no agreement existed pursuant to which Cree expected payment from Benchmark. (See Doc. 62-4 at 16-19.) Third, it appears to this court that the Letter of Authorization ("LOA") could be reasonably expected to contain any agreement regarding payment for scrapped LEDs. Instead, the LOA gave Cree the power to terminate the arrangement at any time, at least in accordance with North Carolina law, rather than any payment expectation outside of the contract. (See, e.g., (Doc. 8), Ex. 1; Mem. Op. & Order (Doc. 56) at 36.) Given this written agreement, there can be no unjust enrichment claim. This court, upon review of all the evidence, finds it reasonable to infer that, if Benchmark failed to meet LED scrap goals, Cree would terminate the relationship as described in the LOA.

**E.    Conversion**

Cree next assigns error to the original findings on its conversion claim and asks this court to disregard Clemons' testimony explaining that one side of the inventory reconciliation report was "frozen." (Cree's Mem. (Doc. 62) at 22.) This court notes that it evaluated Clemons' testimony, in light of his knowledge, and found that his explanation did trigger heightened scrutiny of the inventory reports. This fact weighed _against_ Benchmark because the court credited the shipping documentation more heavily. Moreover, this court reviewed each weekly report sent to Cree, including the XT-E LED side of the inventory reconciliation reports. (See Mem. Op. & Order (Doc. 56) at 46 n.28.) Even disregarding Clemons' testimony on this point entirely would not change this court's conclusion regarding Cree's conversion claim. The original findings properly accounted for the issues raised by Cree; this court declines to re-assess witness credibility at this stage and Cree's argument on its conversion claim is unavailing.

**IV.    CONCLUSION**

In summary, this court finds no basis to alter or amend its judgment, nor does this court find that Cree is entitled to relief under Rules 52(b), 54(c) or 59(a).

For the reasons stated herein, **IT IS HEREBY ORDERED** that Cree's Motion to Amend or Alter Judgment Pursuant to Fed. R. Civ. P. 52(a), 54(c) and 59(e) and for New Trial Pursuant to Fed. R. Civ. P. 59(a), (Doc. 61), is **DENIED**.

This the 5th day of March, 2019.

_____
United States District Judge